PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 17-1107, 17-1109, 17-1110, 17-1111
_____

PROMETHEUS RADIO PROJECT

*National Association of Broadcasters
**Cox Media Group LLC,
                                    Intervenors


v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA

Prometheus Radio Project and Media Mobilizing Project,
                          Petitioners in No. 17-1107

Multicultural Media, Telecom and Internet Counsel and
National Association of Black Owned Broadcasters, Inc.,
                          Petitioners in 17-1109

The Scranton Times, L.P.,
                          Petitioners in 17-1110

Bonneville International Corporation,
                          Petitioners in 17-1111

\* Prometheus Radio Project, Media Mobilizing Project,
Benton Foundation, Common Cause, Media Alliance,
Media Council Hawaii, National Association of Broadcasters
Employees and Technicians Communications Workers of
America, National Organization for Woman Foundation,
Office of Communication of the United Church of Christ Inc.,

Intervenors

\*(Pursuant to the Clerk's Order date 1/18/17)
\*\* (Pursuant to the Clerk's Order dated 2/7/17)

_____

Nos. 18-1092, 18-1669, 18-1670, 18-1671,
18-2943 & 18-3335

_____

PROMETHEUS RADIO PROJECT;
MEDIA MOBILIZING PROJECT,
　　　　Petitioners (No. 18-1092, 18-2943)

INDEPENDENT TELEVISION GROUP,
　　　　Petitioners (No. 18-1669)

MULTICULTURAL MEDIA, TELECOM AND
INTERNET COUNCIL, INC.;
NATIONAL ASSOCIATION OF
BLACK-OWNED BROADCASTERS,
　　　　Petitioners (No. 18-1670, 18-3335)

2

FREE PRESS;
OFFICE OF COMMUNICATION, INC.
OF THE UNITED CHURCH OF CHRIST;
NATIONAL ASSOCIATION OF BROADCAST
EMPLOYEES AND TECHNICIANS-COMMUNICATIONS
WORKERS OF AMERICA; COMMON CAUSE,
Petitioners (No. 18-1671)

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA
_____

On Petition for Review of An Order of
the Federal Communications Commission
(FCC Nos. FCC-1: FCC-16-107; FCC-17-156; FCC-18-114)
_____

Argued June 11, 2019

Before: AMBRO, SCIRICA, and FUENTES, <u>Circuit Judges</u>

(Opinion filed September 23, 2019)

Angela J. Campbell
Andrew J. Schwartzman
James T. Graves
Institute for Public Representation
Georgetown Law
600 New Jersey Avenue, N.W., Suite 312
Washington, DC  20001

Counsel for Petitioners
     Prometheus Radio Project,
     Media Mobilizing Project
Counsel for Intervenor Respondents
     Benton Foundation, National Association of
     Broadcast Employees and Technicians
     Communication Workers of America,
     National Organization for Women Foundation,
     Office of Communication Inc. of the Church
     of Christ,

Cheryl A. Leanza (Argued)
Best Best & Krieger
2000 Pennsylvania Avenue, Suite 5300
Washington, DC  20006

     Counsel for Petitioners
     Prometheus Radio Project, Media Mobilizing Project,
     Office of Communication Inc. of the United Church of
     Christ, National Association of Broadcast Employees
     and Technicians Communications Workers of
     America, Common Cause

Dennis Lane (Argued)
David D'Alessandro
Stinson Leonard Street
1775 Pennsylvania Avenue, N.W., Suite 800
Washington, DC  20006

     Counsel for Petitioner
     Multicultural Media Telecom and Internet Council

National Association of Black Owned
Broadcasters, Inc.

Craig E. Gilmore
Kenneth E. Satten
Wilkinson Barker Knauer
1800 M Street, N.W., Suite 800N
Washington, DC  20036

    Counsel for Petitioners
    Scranton Times LP,
    Bonneville International Corp.

Jack N. Goodman (Argued)
Law Offices of Jack N. Goodman
1200 New Hampshire Avenue, N.W.
Suite 600
Washington, DC  20036

    Counsel for Petitioner
    Independent Television Group

Jessica J. Gonzalez
Free Press
1025 Connecticut Avenue, N.W., Suite 1110
Washington, DC  20036

    Counsel for Petitioner
    Free Press

Thomas M. Johnson, Jr.
  General Counsel
David M. Gossett
  Deputy General Counsel
Jacob M. Lewis (Argued)
  Associate General Counsel
James M. Carr
Matthew J. Dunne (Argued)
William Scher
Richard K. Welch
Federal Communications Commission
445 12th Street, S.W.
Washington, DC  20554

        Counsel for Respondent
        Federal Communications Commission

Makan Delrahim
  Assistant Attorney General
Michael F. Murray
  Deputy Assistant Attorney General
Nickolai Gilford Levin
Robert B. Nicholson
Robert J. Wiggers
United States Department of Justice
Antitrust Division/Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, DC  20004

        Counsel for Respondent
        United States of America

Helgi C. Walker (Argued)
Andrew G. I. Kilberg
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC  20036

     Counsel for Intervenor Petitioner/Respondent
     National Association of Broadcasters

Yosef Getachew
Common Cause
805 15th Street, N.W., Suite 800
Washington, DC  20005

     Counsel for Intervenor Respondent/Petitioner
     Common Cause

David E. Mills
Cooley
1299 Pennsylvania Avenue, N.W., Suite 700
Washington, DC  20004

     Counsel for Intervenor Petitioner
     Cox Media Group LLC

Kevin F. King
Rafael Reyneri
Andrew Soukup
Covington & Burling
850 10th Street, N.W.
One City Center
Washington, DC  20001

Counsel for Intervenor Respondent
Fox Corp.

David D. Oxenford
Wilkinson Barker Knauer
1800 M Street, N.W., Suite 800N
Washington, DC  20036

Counsel for Intervenor Respondent
Connoisseur Media LLC

Paul A. Cicelski
S. Jenell Trigg
Lerman Senter
2001 L Street, N.W., Suite 400
Washington, DC  20036

Counsel for Intervenor Respondent
New Corp.

Eve Klindera Reed
Jeremy J. Broggi
Wiley Rein
1776 K Street, N.W.
Washington, DC  20006

Counsel for Intervenor Respondent
Nextar Broadcasting Inc.

8

Jeetander T. Dulani
Pillsbury Winthrop Shaw Pittman
1200 17th Street, N.W.
Washington, DC 20036

      Counsel for Intervenor Respondent
      Sinclair Broadcast Group Inc.

_____

OPINION OF THE COURT
_____

AMBRO, <u>Circuit Judge</u>

Here we are again. After our last encounter with the periodic review by the Federal Communications Commission (the "FCC" or the "Commission") of its broadcast ownership rules and diversity initiatives, the Commission has taken a series of actions that, cumulatively, have substantially changed its approach to regulation of broadcast media ownership. First, it issued an order that retained almost all of its existing rules in their current form, effectively abandoning its long-running efforts to change those rules going back to the first round of this litigation. Then it changed course, granting petitions for rehearing and repealing or otherwise scaling back most of those same rules. It also created a new "incubator" program designed to help new entrants into the broadcast industry. The Commission, in short, has been busy. Its actions unsurprisingly aroused opposition from many of the same groups that have battled it over the past fifteen years, and that opposition has brought the parties back to us.

One of these petitioners argues that the FCC did not go

9

far enough, and that the same logic by which it repealed the so-called "eight voices" test of the local television ownership rule (which forbade mergers that would leave fewer than eight independently-owned stations in the market) should also have led it to abolish the "top-four" restriction in the same rule (which forbids mergers among two or more of the four largest stations in a market). We disagree; this was a reasonable exercise of the Commission's policy-making discretion, as we held in the first round of this litigation.

Another group of petitioners argues that the Commission's new incubator program is badly designed, as its definition of "comparable markets" for the reward waivers was unlawfully adopted and would create perverse incentives. It also argues that the Commission has unreasonably failed to act on a proposal to extend the so-called "cable procurement rules," which promote diversity in the cable television industry, to broadcast media. We disagree: the "comparable markets" definition for the incubator program was also a reasonable exercise of discretion, and the FCC's failure to act on the procurement rules proposal is not unreasonable so far.

We do, however, agree with the last group of petitioners, who argue that the Commission did not adequately consider the effect its sweeping rule changes will have on ownership of broadcast media by women and racial minorities. Although it did ostensibly comply with our prior requirement to consider this issue on remand, its analysis is so insubstantial that we cannot say it provides a reliable foundation for the Commission's conclusions. Accordingly, we vacate and remand the bulk of its actions in this area over the last three years. In doing so, we decline to grant the requested extraordinary relief of appointing a special master to oversee the FCC's work on remand.

## I. Background

To avoid sounding like a broken record, we recount only in brief the history of this case up through our most recent decision. The full account of the entire saga can be found in our earlier opinions. *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 382–89 (3d Cir. 2004) ("*Prometheus I*"); *Prometheus Radio Project v. FCC*, 652 F.3d 431, 438–44 (3d Cir. 2011) ("*Prometheus II*"); and *Prometheus Radio Project v. FCC*, 824 F.3d 33, 37–39 (3d Cir. 2016) ("*Prometheus III*").

Under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.*, Pub. L. No. 73-416, 48 Stat. 1064 (1934), the Federal Communications Commission has long maintained a collection of rules governing ownership of broadcast media. By preventing any one entity from owning more than a certain amount of broadcast media, these rules limit consolidation and promote a number of interests, commonly stated as "competition, diversity, and localism." *See, e.g.*, *Report and Order and Notice of Proposed Rulemaking—2002 Biennial Regulatory Review*, 18 F.C.C.R. 13620 ¶ 8 (July 2, 2003). By 1996, however, there was growing sentiment that these rules were overly restrictive, and so Congress passed the Telecommunications Act. Pub. L. No. 104–104, 110 Stat. 56 (1996). Section 202(h) of that Act requires the Commission to review the broadcast ownership rules on a regular basis— initially biennial, later amended to quadrennial, *see* Pub. L. No. 108–199, § 629, 118 Stat. 3, 99–100 (2004)—to "determine whether any of such rules are necessary in the public interest as the result of competition." Telecommunications Act, § 202(h). The Commission "shall repeal or modify any regulation it determines to be no longer in the public interest." *Id.*

11

Thrice before we have passed on the Commission's performance of its duties under § 202(h), or the lack thereof. In *Prometheus I* we reviewed the results of the 2002 quadrennial review cycle. Then in *Prometheus II* we reviewed the results of the 2006 review cycle, which included the FCC's actions on remand from *Prometheus I*, as well as a separate order adopting various policies designed to promote broadcast media ownership by women and racial minorities.

After *Prometheus II* the Commission failed to complete its 2010 review cycle prior to the start of the 2014 cycle, and so in *Prometheus III* we reviewed not final agency action pursuant to § 202(h) but rather, for the most part, agency inaction. Although we found the FCC had unreasonably delayed action on the 2010 and 2014 review cycles, we declined to vacate the broadcast ownership rules in their entirety, but noted such a drastic remedy could become appropriate in the future if the Commission continued dragging its feet. *Id.*, 824 F.3d at 53–54. Relatedly, we remanded a newly adopted rule governing the treatment of joint sales agreements for purposes of the television local ownership rule, reasoning that the FCC could not have a valid basis for promulgating such a rule without first having determined, as required by § 202(h), that the local ownership rule itself should remain in place. *Id.* at 58–60.

We also held that the Commission had unreasonably delayed a determination on the definition of "eligible entities." These are given certain preferences under the ownership rules, *see id.* at 41, and the purpose of these preferences was to encourage ownership by women and minorities. The definition, however, was drawn from the Small Business Administration's definition of small businesses, and focused solely on a company's revenues. In *Prometheus I* we had suggested that, on remand, the FCC should consider adopting a different definition

12

based on the criteria for "socially and economically disadvantaged businesses" ("SDBs"). *See* 373 F.3d at 428 n.70; *see also* 13 C.F.R. § 124.103 (defining socially disadvantaged businesses). The Commission declined to adopt an SDB definition, and in *Prometheus II* we held that the revenue-based definition was arbitrary and capricious because there was no evidence it would advance the goals of increasing ownership by women and minorities. 652 F.3d at 469–71.

But the Commission had not reached a determination one way or the other by *Prometheus III*. Instead it had suggested— in various documents issued after *Prometheus II*, none of which constituted final agency action on the matter—that it would reject a SDB definition, or the similar "overcoming disadvantage preference" ("ODP") proposal, because it did not believe those rules could survive constitutional scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *See* 824 F.3d at 45–48. It therefore indicated its tentative plan to adopt the same definition we held unlawful in *Prometheus II*, even though it still lacked evidence that this would promote ownership diversity, because promoting ownership by small businesses would be in the public interest regardless. *Id*. at 46.

We held that the Commission "had more than enough time to reach a decision on the eligible entity definition." *Id*. at 48. This led to a remand and an "order [to] the Commission . . . to act promptly to bring the eligible entity definition to a close." *Id*. at 50. It was to "make a final determination as to whether to adopt a new definition;" "[i]f it need[ed] more data to do so, it must get it." *Id*. Finally, we pointed out that we did "not intend to prejudge the outcome" of the FCC's analysis, and that we would review the merits of its eventual decision once that decision had been made through a final order. *Id*. at 50–51.

13

Three months after we decided *Prometheus III*, the Commission followed through on its promise to take final action on the 2010 and 2014 review cycles. Its *Second Report and Order, 2014 Quadrennial Regulatory Review*, 31 F.C.C.R. 9864 (2016) (the "*2016 Report & Order*"), retained all of the major broadcast ownership rules—the newspaper/broadcast cross-ownership rule, the radio/television cross-ownership rule, the local radio ownership rule, and the local television ownership rule—in their existing forms. It also adopted, again, a revenue-based definition for eligible entities. It concluded that an SDB or any related race- or gender-conscious definition could not withstand constitutional scrutiny because, even though courts might accept viewpoint diversity as a compelling governmental interest, the evidence did not show a meaningful connection between female or minority ownership and viewpoint diversity. *Id*. ¶ 297. The Commission also declined to adopt an ODP standard, reasoning that it would require individualized assessment that is not compatible with the smooth operation of the FCC's rules, and that such an individualized assessment could run afoul of First Amendment principles. *Id*. ¶ 306. On a related issue, the Commission declined to implement an "incubator program," under which established broadcasters would be encouraged to assist new entrants to break into the industry, that would have employed an ODP standard. Finally, the Commission reviewed a number of other proposals to increase ownership diversity, rejecting most but noting some merit in a proposal to extend the cable procurement rules, which require cable companies to encourage minority-owned businesses to work with them, to broadcast media. The Commission did not adopt this idea, instead calling for further comment.

A number of industry groups filed a petition for rehearing, and in November 2017 the Commission granted that petition in its *Order on Reconsideration and Notice of Proposed*

14

*Rulemaking*, 32 F.C.C.R. 9802 (2017) (the "*Reconsideration Order*"). This Order made sweeping changes to the ownership rules. It eliminated altogether the newspaper/broadcast and television/radio cross-ownership rules. It modified the local television ownership rule, rescinding the so-called "eight voices" test but retaining the rule against mergers between two of the top four stations in a given market—albeit now subject to a discretionary waiver provision. And it announced the Commission's intention to adopt an incubator program, although it left the formal implementation of that program to a subsequent order. In this context, the Reconsideration Order called for comment on various aspects of the program, including how to define eligibility and how to encourage participation by established broadcasters.

In August 2018 the Commission issued the *Report and Order—In the Matter of Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, 33 F.C.C.R. 7911 (2018) (the "*Incubator Order*"). That Order established a radio incubator program that would encourage established broadcasters to provide "training, financing, and access to resources" for new entrants in the market. *Id.* ¶ 6. Eligibility to receive this assistance was defined using two criteria: an incubated entity must (1) qualify as a small business under the Small Business Administration's rules, and (2) qualify as a "new entrant," meaning that it must own no television stations and no more than three radio stations. *Id.* ¶ 8. The eligibility criteria make no overt reference to race, gender, or social disadvantage, but the Commission concluded that using the "new entrant" criterion would help boost ownership by women and minorities, as a bidding preference for new entrants in FCC auctions had that effect. *Id.* ¶ 21.

As an incentive for established broadcasters to participate

15

in the program, the Incubator Order grants the incubating entity a reward waiver for the local radio ownership rules. Among other options, the waiver may be used in any market "comparable" to the one in which incubation occurs. *Id*. ¶ 66–67. This means that it must be in the same market tier for purposes of the local radio rule, and these tiers are defined by the number of stations in a market. One tier runs from zero to 14 stations, another from 15 to 29, a third from 30 to 44, and finally the highest tier includes all markets with 45 or more stations.

Before us are 10 different petitions for review challenging different aspects of the Commission's actions since *Prometheus III*. After the 2016 Report & Order issued in November of that year, Prometheus Radio Project ("Prometheus") and Media Mobilization Project ("MMP") filed a petition for review in our Court. About the same time, three other petitions for review of the 2016 Report & Order were filed in the D.C. Circuit Court of Appeals: one by The Scranton Times, L.P. ("Scranton"); one by Bonneville International Corporation ("Bonneville"); and one jointly by the Multicultural Media, Telecom and Internet Council, Inc. ("MMTC") and the National Association of Black-Owned Broadcasters ("NABOB"). The cases before the D.C. Circuit were transferred here and the four cases consolidated in January 2017; they were then held in abeyance while the Commission considered the petitions for rehearing.

After the Reconsideration Order issued in November 2017, four additional petitions for review were filed: one by Prometheus and MMP in our Court as well as three in the D.C. Circuit from (1) Independent Television Group ("ITG"), (2) MMTC and NABOB, and (3) a coalition of groups including Free Press, the Office of Communication, Inc. of the United

16

Church of Christ ("UCC"), the National Association of Broadcast Employees and Technicians—Communications Workers of America ("NABET-CWA"), and Common Cause. Once again the D.C. Circuit transferred the petitions before it to our Court, and we consolidated the new wave of cases with the existing petitions.

In February 2018 we stayed all proceedings pending the close of notice and comment on the Incubator Order. Once the final Order issued in August 2018, Prometheus and MMP filed a petition for review in our Court, and MMTC and NABOB filed another in the D.C. Circuit that was transferred here and the cases consolidated.

For purposes of briefing and oral argument, the various petitioners divided into three groups. The first included Prometheus, MMP, Free Press, UCC, NABET-CWA, and Common Cause, who argue that the Commission has not adequately considered how its changes to the broadcast ownership rules will affect ownership by women and racial minorities. We refer to this group as "Citizen Petitioners," consistent with our past practice. *See Prometheus III*, 824 F.3d at 39. A second group, consisting of MMTC and NABOB, argues that the Incubator Order's definition of "comparable markets" is unlawful and that the Commission has unreasonably withheld action on a proposal to extend cable procurement rules to broadcast media. To distinguish this group, we refer to its members as "Diversity Petitioners." Finally, ITG—standing alone now as the only "Deregulatory Petitioner"—challenges the retention of the "top-four" component of the local television rule (which, to repeat, bans mergers between two or more of the four largest stations in a given market).

The Commission defends its orders in their entirety. Additionally, a group of Intervenors—including both Scranton and Bonneville as well as many of the Deregulatory Petitioners from prior rounds of this litigation—defends the FCC's actions and argues further that Citizen and Diversity Petitioners lack standing.

## II. Jurisdiction and Standard of Review

We have jurisdiction to hear these petitions for review of agency action under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). As noted above and covered in § III.A below, Intervenors argue, with the support of the Commission, that Citizen and Diversity Petitioners lack standing.

Per § 706(2) of the Administrative Procedure Act ("APA"), we can set aside agency action that is arbitrary or capricious. 5 U.S.C. § 706(2). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Despite this deference, we require the agency to "examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

When the FCC conducts a Quadrennial Review under § 202(h), that provision also affects our standard of review, as it requires that "no matter what the Commission decides to do to any particular rule—retain, repeal, or modify (whether to make more or less stringent)—it must do so in the public interest and support its decision with a reasoned analysis." *Prometheus I*,

18

373 F.3d at 395. When § 202(h) refers to rules being "necessary," that term means "useful," "convenient," or "helpful." *Id.* at 394.

This case also involves challenges to agency inaction. Section 706(1) of the APA allows us to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Under this provision, our "polestar is reasonableness." *Public Citizen Health Research Grp. v. Chao*, 314 F.3d 143, 151 (3d Cir. 2002). We must "balance the importance of the subject matter being regulated with the regulating agency's need to discharge all of its statutory responsibilities under a reasonable timetable." *Oil, Chem. & Atomic Workers Union v. Occupational Safety & Health Admin.*, 145 F.3d 120, 123 (3d Cir. 1998).

> With this balance in mind, unreasonable delay should be measured by the following factors: First, the court should ascertain the length of time that has elapsed since the agency came under a duty to act. Second, the reasonableness of the delay should be judged in the context of the statute authorizing the agency's action. Third, the court should assess the consequences of the agency's delay. Fourth, [it] should consider any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.

*Id.* (internal quotation marks omitted).

19

### III. Analysis

#### A. Standing

As a threshold matter, Intervenors argue that Citizen and Diversity Petitioners (called "Regulatory Petitioners" for ease of reference in this section) lack standing, and the FCC concurs in that argument. To have standing to sue in federal court under Article III of the Constitution, a plaintiff must have (1) an "injury in fact," meaning "an invasion of a legally protected interest which is (a) concrete and particularized[,] and (b) actual or imminent, not conjectural or hypothetical," that is (2) "fairly traceable to the challenged action of the defendant," and it must (3) be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotation marks omitted).

There are two separate disputes regarding Regulatory Petitioners' standing. First is a procedural question. After Intervenors raised the issue in their merits brief, Regulatory Petitioners submitted declarations to establish standing along with their reply briefs. Intervenors now argue that we should not consider those declarations or the facts asserted within them because materials to establish standing must be submitted instead with Regulatory Petitioners' opening briefs. Even accepting the declarations, Intervenors still dispute standing.

We disagree on both counts. It is well established that petitioners challenging agency action may supplement the administrative record for the purpose of establishing Article III standing, even though judicial review of agency action is usually limited to the administrative record. As the Tenth Circuit

observed in *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012), the Article III standing requirements do not apply to agency proceedings, and thus there is no reason for the facts supporting standing to be a part of the administrative record. It is, moreover, the practice in most of the Circuits that have considered the matter to accept these materials at any stage of the litigation. In *US Magnesium* itself, for example, the Tenth Circuit accepted supplemental materials that were attached to a petitioner's reply brief. *Id.* (Its discussion did not squarely address the timing issue, only whether a court could properly go beyond the administrative record to ascertain standing at all.) The Seventh Circuit has accepted supplemental submissions filed after oral argument. *Texas Indep. Producers and Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 971 (7th Cir. 2005). And the Ninth Circuit has expressly held that standing need not be established in an opening brief in cases like this. *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997).

Against this, Intervenors marshal two sources of contradictory authority. First is the Supreme Court's statement, in a footnote in *Lujan* itself, that "standing is to be determined at the *commencement* of suit." 504 U.S. at 570 n.5 (emphasis added). This is not on point. That footnote sought only to rebut an argument from Justice Stevens's dissenting opinion that, although the agencies whose actions would harm the petitioners there were not technically parties to the lawsuit, those agencies would not ignore a decision from the Supreme Court interpreting the relevant legal provisions, and thus such a decision would actually redress the petitioners' injuries. The majority rejected this argument because it depended entirely on the contingent fact that the Supreme Court ended up taking the case, which could not have been known at the start of suit. Hence "commencement of suit" indicates only that standing must exist at the beginning of litigation, not that the materials

21

establishing standing must be submitted at that time.

The other authorities cited by Intervenors are cases from the D.C. Circuit. *See, e.g.*, *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). But that Circuit has a provision of its local rules expressly requiring the petitioners in any "cases involving direct review . . . of administrative actions" to file materials establishing standing along with their opening brief. *See* D.C. Cir. Rule 28(a)(7). The cases cited by Intervenors all simply applied this rule, which does not apply to proceedings in our court.

It appears that this is a question of first impression in our Circuit. To resolve it, we adopt the view held overtly by the Ninth Circuit and implicitly by the Tenth and Seventh: parties may submit materials to establish standing at any time in the litigation.[1] This is especially so here, where the same parties have been litigating before us for a decade and a half. It was not unreasonable for Regulatory Petitioners to assume that their qualification to continue in the case was readily apparent. *Cf. Del. Dep't. of Nat'l Res. & Envtl. Control v. EPA*, 785 F.3d 1, 8–9 (D.C. Cir. 2015) (permitting petitioners to submit standing materials with their reply brief despite the contrary requirement of the D.C. Circuit's local rules when they reasonably believed

---

[1] As noted, other courts have gone so far as to accept standing materials submitted after oral argument. *See Texas Indep. Producers and Royalty Owners Ass'n*, 410 F.3d at 971. This could be appropriate where the issue of standing is not raised until oral argument. Although we do not set out a comprehensive rule for all cases, in general materials to establish standing should be submitted promptly once standing is called into question.

that standing was self-evident).

Turning to the substance of standing, Intervenors argue that Regulatory Petitioners' alleged harm is not sufficiently imminent to establish standing because any mergers under the new rules would require FCC approval and would be subject to judicial review; in effect, Regulatory Petitioners have not produced evidence that the rule changes will lead to additional consolidation. In addition, Intervenors continue, Regulatory Petitioners lack standing because their objections to the rule changes pertain to ownership diversity and not to the § 202(h) purpose of promoting competition. We find none of these arguments persuasive.

The first two arguments share a common theme: although Regulatory Petitioners will be harmed by consolidation within the industry (a fact Intervenors do not appear to contest), it is speculative that the new rules will actually lead to consolidation. The problem is that encouraging consolidation is a primary purpose of the new rules. This is made clear throughout the Reconsideration Order, *see, e.g.*, 32 F.C.C.R. at 9811, 9836. The Government cannot adopt a policy expressly designed to have a certain effect and then, when the policy is challenged in court by those who would be harmed by that effect, respond that the policy's consequences are entirely speculative. Intervenors cite *Rainbow/PUSH Coalition v. FCC*, 330 F.3d 539, 542–44 (D.C. Cir. 2003), but that case only held that petitioners there, who sought to assert standing simply as audience-members, had to demonstrate that a proposed merger would have some specific baleful effect(s) on the viewing audience, *i.e.*, some degradation of the programming available to that audience. Here Intervenors do not contest that consolidation, if it occurs, will harm the Regulatory Petitioners.

23

Nor is it material that any future mergers would require FCC approval. The point is that, under the new rules, it will approve mergers that it would have rejected previously, with the rule changes in the Reconsideration Order the key factor causing those grants of approval. *See* Sara Fischer, *The local TV consolidation race is here*, Axios (Aug. 10, 2018), *available at* https://www.axios.com/the-local-tv-consolidation-war-is-here-7c65f3fb-eaab-43c4-9a00-81303867dbee.html ("Many local broadcasters cite one key reason for their consolidation— [t]he FCC's landmark decision last year to roll back old regulations that limited the ability of TV companies to own properties in the same market."). Intervenors' citation to *Clapper v. Amnesty International, USA*, 568 U.S. 398, 410–11 (2013), is not to the contrary. It involved a "highly attenuated chain of possibilities" that, among other things, would make it difficult to discern whether the challenged law was even the cause-in-fact of the plaintiffs' alleged injuries.[2] The causal

---

[2] *Clapper* involved a challenge to Section 702 of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1881a, part of the 2008 FISA Amendments. Pub. L. No. 110-261, 122 Stat. 2436 (2008). The chain of possibilities the Court identified ran as follows: "(1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under [§ 702] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy [§ 702]'s many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and

chain here is anything but attenuated.

Intervenors' third argument fails for multiple reasons. First, they identify incorrectly the goals of § 202(h) as limited to promoting competition. Instead, as its text makes plain, review under that provision is intended to determine whether each of the ownership rules serves the public interest, broadly conceived, in light of ongoing competitive developments within the industry. *See Prometheus I*, 373 F.3d at 390–95.

In addition, there is no requirement that the harm alleged be closely tied to a challenger's legal argument in order to have Article III standing. Intervenors invoke a second *Rainbow/PUSH Coalition v. FCC* case, 396 F.3d 1235, 1242–43 (D.C. Cir. 2005), there involving an objection to renewal of a radio station's license because it had allegedly engaged in employment discrimination. Audience members, the D.C. Circuit held, lacked standing to object because the alleged violative conduct at issue had not harmed them at all. This does not support the notion that a party may lack standing, even though it will suffer a concrete and particularized injury, simply because it is the wrong "kind" of injury. That argument sounds not in the requirements of Article III but of "prudential standing," a now-discredited doctrine under which courts would decline to hear cases within their jurisdiction if the plaintiffs' complaint did not fall within the "zone of interests" protected by the law they invoked. In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Supreme Court held that this should be understood solely as a matter of statutory construction, *i.e.*, of determining whether a given statutory cause of action extended to a particular plaintiff. Intervenors do not

(5) respondents will be parties to the particular communications that the Government intercepts."

25

argue, and could not seriously contend, that Regulatory Petitioners do not qualify as "aggrieved parties" for purposes of the APA's general cause of action. *See* 5 U.S.C. § 702.

We emerge from the bramble to hold that Regulatory Petitioners have standing. Thus we proceed to the merits issues before us.

## B. Retention of the Top-Four Rule

Deregulatory Petitioner ITG argues that the FCC's decision to retain its "top-four" local television rule, prohibiting the merger of any two of the top four stations in a given market, while rescinding the "eight voices" rule, was arbitrary and capricious. This is an issue we dealt with before, in *Prometheus I*, when we upheld the top-four restriction against deregulatory challenges. We noted that "we must uphold an agency's line-drawing decision when it is supported by the evidence in the record." *Prometheus I*, 373 F.3d at 417 (citing *Sinclair Broadcast Group, Inc. v. FCC*, 284 F.3d 148, 162 (D.C. Cir. 2002); *AT&T Corp. v. FCC*, 220 F.3d 607, 627 (D.C. Cir. 2000)). And the Commission had ample record evidence supporting its decision to draw the line at four: it saw a "cushion" of audience share between the fourth- and fifth-ranked stations, reflecting that the top four would be the affiliates of the four major national networks (ABC, CBS, NBC, and Fox); the same cushion was apparent in national viewership figures for the networks themselves; mergers between the third- and fourth-largest stations in each of the ten largest markets would produce a new largest station; and mergers among top-four stations would generally increase the statistical consolidation of the local market by a substantial amount. *Id.* at 418.

26

Now ITG argues that the FCC "failed to recognize that the same reasons it found supported repeal of the Eight-Voice test also required it to repeal or modify the Top-Four Prohibition." ITG Br. at 20. It first takes issue with the notion of a ratings "cushion" between the top-four and other stations, in part questioning whether the cushion exists and in part asking why it should matter. *Id.* at 28–29. It further contests the FCC's reliance on its conclusion, from the 2002 review cycle, that mergers among top-four stations would generally result in a new largest station, noting that the evidence shows that mergers between the third- and fourth-largest stations would not result in a new largest entity in roughly half of the markets with at least four stations. *Id*. at 29–30. Finally, it argues that the new waiver provision cannot excuse that, as it sees things, the rule as a whole is not rationally related to the facts. *Id*. at 31–32.

We disagree. None of ITG's arguments meaningfully distinguish our holding in *Prometheus I*. Just as in that case, ITG simply takes issue with the way in which the Commission chose to draw the lines. The basic logic of the top-four rule, as we recognized in 2004, is that while consolidation may offer efficiency gains in general, mergers between the largest stations in a market pose a unique threat to competition. *See Prometheus I*, 373 F.3d at 416. Although there might be other more tailored, and more complex, ways to identify those problematic mergers, the simplest is to declare, as the Commission has done, that mergers between two or more of the largest X stations in a market are not permitted. The choice of X must be somewhat arbitrary: each market's contours will be slightly different, and no single bright-line rule can capture all this complexity. But the television industry does generally feature a distinct top-four, corresponding to the four major national networks, and four is therefore a sensible number to pick. And this is exactly the kind of line-drawing, where any line drawn may not be perfect, to which courts are the most

deferential. *See id.* at 417. ITG has much to say about everything this simple rule misses, but that is beside the point. The Commission has the discretion to adopt a blunt instrument such as the top-four rule if it chooses. Indeed we confronted, and rejected, this exact argument—that treating all top-four stations the same wrongly ignored the variation in market structures—in *Prometheus I*. *Id.* at 417–18.

Nor is it improper that the FCC's justification for this rule is the same as it was in the 2002 review cycle. Section 202(h) requires only that the Commission think about whether its rules remain necessary every four years. It does not imply that the policy justifications for each regulation have a shelf-life of only four years, after which they expire and must be replaced. Nor does § 202(h), or any other authority cited by ITG, require that the Commission always base its decisions on perfectly up-to-date data. In any event, ITG itself cites more recent data presented to the Commission through the administrative process, and this information paints a picture materially identical to what the Commission saw in 2002.

In this context, we reaffirm our conclusion from *Prometheus I* that retention of the top-four rule is amply supported by record evidence and thus is not arbitrary or capricious.[3]

---

[3] Accordingly, we need not address ITG's argument that the newly added waiver provision, which allows the Commission to permit a merger that would otherwise be barred by the top-four rule if "the reduction in competition is minimal and is outweighed by public interest benefits," *Reconsideration Order* ¶ 82, cannot save an otherwise irrational rule.

## C. "Comparable Markets" Definition

Diversity Petitioners challenge the Incubator Order's definition of comparable markets for radio stations, arguing that it was not properly noticed and in any event was arbitrary and capricious.

Their argument devolves to this. The basic concept of the incubator program uses a waiver of the rules governing local radio ownership as a reward to induce participation by established broadcasters. The Notice of Proposed Rulemaking ("NPRM") sought comment on the following questions about these reward waivers: "How should the Commission structure the waiver program? For example, should the waiver be limited to the market in which the incubating activity is occurring? Alternatively, should waiver be permissible in any similarly sized market? How would the Commission determine which markets are similar in size?" *Reconsideration Order ¶* 137. Diversity Petitioners take this to indicate only that the Commission was considering two possibilities: either that the waiver could only be used in the same market where the incubating activity occurred or that it could be used in other markets of similar population. They contend that "size" in this context is most naturally read as referring to population, or some other indicator of market size (such as audience or listenership numbers), as opposed to the number of radio stations in the market. The two responsive comments on this issue, they contend, seem to have reflected this assumption. *See* Diversity Petitioners' Br. at 16–17.

Instead, as noted, the Incubator Order adopted a system of reward waivers that can be used in any "comparable" market, meaning not a market of similar population but one with a

29

similar number of radio stations. This proposal was first described in detail in the draft of the Incubator Order made available before the final order was promulgated. In response, Diversity Petitioners made several *ex parte* communications with the Commission expressing their concern over this definition of "comparable" markets. *Id.* at 21–22. Their letters expressed concern that the proposed rule would allow a broadcaster to incubate in a small rural market and then use its reward waiver in a much larger market, such as New York City, thus getting an outsized return for its investment. Thus Diversity Petitioners suggested that the rule should disallow using a waiver in another top-tier "comparable" market that is not within five spots of the incubating market in the Nielsen population-based rankings, but the Commission declined to adopt this proposal. *See Incubator Order* ¶ 68.

Diversity Petitioners argue that this was not adequate notice. We have addressed similar claims in both *Prometheus I*, 373 F.3d at 411–412, and *Prometheus II*, 652 F.3d at 449–50. Essentially, "the adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the 'subjects and issues' before the agency." *Prometheus I*, 373 F.3d at 411 (quoting *Am. Iron & Steel Inst. v. EPA*, 568 F.3d 284, 293 (3d Cir. 1977)). The strongest fact supporting Diversity Petitioners' claim is the swift response by commenters expressing surprise once the eventual definition of comparable markets was made public. Courts will consider the behavior of commenters in assessing whether notice was adequate. *See, e.g.*, *Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003).

But parsing the language of the Notice of Proposed Rulemaking itself suffices to show that it did provide adequate notice. Specifically, after asking whether the waiver

30

should be applicable in any similarly sized market, the NPRM asked how the Commission would determine which markets are similarly sized. This strongly suggests that the Commission was considering a range of different ways to measure market size, and it undercuts Diversity Petitioners' assertion that the word "size" could only be read to mean population. *See* Diversity Petitioners' Br. at 16 ("The reference to 'size' in the NPRM is generally understood in the broadcast industry to mean markets that have similar populations.").

Turning to the substance of the comparable markets definition, Diversity Petitioners assert that the FCC's definition will create a perverse incentive for established broadcasters to incubate in markets with low populations but many radio stations (using the example of Wilkes-Barre, Pennsylvania) and then use their waivers in "comparable" markets with much greater populations (*e.g.*, New York City). The Incubator Order responded to this concern by noting that some markets with similar populations have vastly different numbers of stations, and stated that "[i]n crafting our standard, we focused primarily on preventing the potential for ownership consolidation in a market with fewer stations and independent owners than the market in which the incubation relationship added a new entrant." *Incubator Order* ¶ 68. It expected that incubating entities will not necessarily use their waivers only in the largest markets, but rather wherever they face ownership restrictions under the FCC's rules. *Id*. And it noted that some incubating entities might not have relevant ownership interests in other markets of similar population size, such that they would have no flexibility under Diversity Petitioners' proposed rules. *Id*.

Diversity Petitioners posit this as an inadequate response, but we disagree. They are correct that the Commission did not rebut the suggestion that waivers might be used in markets with

31

much higher populations than the ones where incubation is occurring. It explained instead why it did not think this prospect overly frightening. Diversity Petitioners suggest that this dynamic could reduce the positive influence of the incubator program on ownership diversity, as (they claim) smaller markets like Wilkes-Barre are less diverse. This is not supported by the record: as Intervenors note, many smaller markets are quite racially diverse, *see* Intervenors' Br. at 50, and Diversity Petitioners' rejoinder that these markets contain fewer total people of color than big cities like New York or Los Angeles, Diversity Petitioners' Reply Br. at 17 n.7, is essentially tautological. And we cannot say that the Commission's focus on the potential anti-competitive effects of the waiver program is unreasonable, for the waivers relate specifically to rules designed to promote competition.

We therefore hold that the definition of "comparable markets" in the Incubator Order was adequately noticed and is not arbitrary and capricious.

## D. Effect of Rule Changes on Ownership Diversity

Citizen Petitioners argue that the Commission did not adequately consider the effect its new rules would have on ownership of broadcast media by women and racial minorities. We agree. In *Prometheus III* we stated that the ongoing attempt to bring the 2010 and 2014 review cycles to a close must "include a determination about the effect of the rules on minority and female ownership." 824 F.3d at 54 n.13 (internal quotation marks omitted). Both the 2016 Report & Order and the Reconsideration Order ostensibly included such a determination, and each concluded that the broadcast ownership rules have minimal effect on female and minority ownership.

But these conclusions were not adequately supported by the record, and thus they were arbitrary and capricious.

The 2016 Report & Order retained all of the existing ownership rules, but it also addressed a proposal to tighten the local television and radio ownership rules as a means of promoting ownership diversity. The Commission rejected this proposal because it found no evidence that reducing consolidation would have that effect based on the following evidence. The National Telecommunications and Information Administration ("NTIA") had collected data regarding the number of minority-owned stations in the late 1990s. About a decade later, the FCC itself began collecting this data through a survey using what is called "Form 323." *See Prometheus III*, 824 F.3d at 44 (discussing the use of Form 323 to gather data about minority ownership). It did so with the express purpose of generating better data about ways to increase ownership by women and minorities. *Id.*

What the 2016 Report & Order did was to compare the NTIA data from the late 1990s, around the time that the local ownership rules were first relaxed, with the subsequent Form 323 data. It saw the same pattern for television and for radio: an initial decrease in minority-owned stations after the rules became more flexible to permit more consolidation, followed by a long-term increase. The NTIA showed 312 minority-owned radio stations in 1995, just before the local radio rule was relaxed, followed by 284 in 1996–97, 305 in 1998, and 426 in 1999–2000. Form 323 data, meanwhile, showed 644 such stations in 2009, 756 in 2011, and 768 in 2013. *See 2016 Report & Order* ¶ 126–28. Turning to television, NTIA data showed 32 minority-owned stations in 1998—just before the local television rule was relaxed—and 23 stations in 1999–2000, while Form 323 data showed 60 stations in 2009, 70 in 2011,

and 83 in 2013.  *Id*. ¶ 77.

Because the trendlines did not show that relaxing these rules had played a major role in restricting ownership diversity, the Commission thought that reversing the process (that is, tightening local radio and television ownership rules) would also be unlikely to have a major effect.  *Id.* ¶ 126.  At the same time it did not think that further loosening the rules would be an effective means of promoting diversity, as the data did not suggest that the increase from the late 1990s through the 2009–13 period had been *caused* by the relaxed rules.  *See id*. ¶ 78, 128.  The Order stated that the Commission remained "mindful of the potential impact of consolidation . . . on ownership opportunities for . . . minority- and women-owned businesses, and we will continue to consider the implications in the context of future quadrennial reviews."  *Id*. ¶ 128.  The 2016 Report & Order also cited this same data to suggest that its modest revisions to the cross-ownership rules would not be likely to have a major influence on ownership diversity.  *Id*. ¶ 196 n.586.

The Reconsideration Order, by contrast, did make major changes to the ownership rules, and it invoked the same evidence as the 2016 Report & Order to conclude that this would not meaningfully affect ownership diversity.  Thus it stated, as to the cross-ownership rules, that "record evidence demonstrates that previous relaxations of other ownership rules have not resulted in an overall decline in minority and female ownership of broadcast stations, and we see no evidence to suggest that eliminating the [Newspaper/Broadcast Cross-Ownership] Rule will produce a different result and precipitate such a decline."  *Reconsideration Order*, ¶ 46.  As to the local television rule, the Order concluded that "the record does not support a causal connection between modifications to the Local Television Ownership Rule and minority and female ownership

levels;" thus the modifications "are not likely to harm minority and female ownership." *Id*. ¶ 83.

Problems abound with the FCC's analysis. Most glaring is that, although we instructed it to consider the effect of any rule changes on female as well as minority ownership, the Commission cited no evidence whatsoever regarding gender diversity. It does not contest this. *See* Respondent's Br. at 40 n.14. Instead it notes that "no data on female ownership was available" and argues that it "reasonably relied on the data that was available and was not required to fund new studies." *Id*. Elsewhere, however, the Commission purports to have complied with our instructions to consider both racial and gender diversity, repeatedly framing its conclusion in terms that encompass both areas. *See, e.g.*, *id*. at 33–36. The trouble is that any ostensible conclusion as to female ownership was not based on *any* record evidence we can discern. Courts will find agency action arbitrary and capricious where the agency "entirely fail[s] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, and that is effectively what happened here. The only "consideration" the FCC gave to the question of how its rules would affect female ownership was the conclusion there would be no effect. That was not sufficient, and this alone is enough to justify remand.

Even just focusing on the evidence with regard to ownership by racial minorities, however, the FCC's analysis is so insubstantial that it would receive a failing grade in any introductory statistics class. One basic problem is the way the Commission treats the NTIA and Form 323 data as comparable, even though these two data sets were created using entirely different methodologies. For example, we do not know how many minority-owned stations the Form 323 survey would have found in 1999, or how many the NTIA's methods would have

35

found in 2009. Indeed the NTIA data is known to be substantially incomplete, and the large increase in minority-owned radio stations it showed between 1998 and 1999–2000 is thought to have been caused by largely improved methodology rather than an actual increase in the number of minority-owned stations. *2016 Report & Order* ¶ 126. Attempting to draw a trendline between the NTIA data and the Form 323 data is plainly an exercise in comparing apples to oranges, and the Commission does not seem to have recognized that problem or taken any effort to fix it.

Even if we could treat the use of these two data sets as reliable, the FCC's statistical conclusions are woefully simplistic. They compare only the absolute number of minority-owned stations at different times, and make no effort to control for possible confounding variables. The simplest of these would be the total number of stations in existence. We do not know, for example, whether the *percentage* of stations that are minority-owned went up or down from 1999 to 2009.

And even if we only look at the total number of minority-owned stations, the FCC did not actually make any estimate of the effect of deregulation in the 1990s. Instead it noted only that, whatever this effect was, deregulation was not enough to prevent an overall increase during the following decade. The Commission made no attempt to assess the counterfactual scenario: how many minority-owned stations there would have been in 2009 had there been no deregulation.

An analogy helps illustrate this point: if an economy that has been growing at an annual 2% rate suffers a serious depression in which it shrinks by 10%, and then resumes growing at the same 2% rate, a decade later it will likely be

bigger than it was on the eve of the depression. But this does not mean that the depression had no effect on the size of the economy. Nothing in the FCC's analysis rules out, or even addresses, the possibility that the 1990s deregulation caused such a one-time "depression" of minority ownership even if it did not reverse the long-term increase in minority-owned stations.

The Commission does not really contest any of these deficiencies in its data or its analysis. Instead it argues that they are irrelevant. It notes, first of all, that ownership diversity is just one of many competing policy goals it must balance when adjusting its regulations. Respondent's Br. at 32–33. Thus, the Reconsideration Order noted that the Commission should not retain a rule that unduly burdened the competitive practices of all broadcasters "based on the unsubstantiated hope that these restrictions will promote minority and female ownership." *Reconsideration Order* ¶ 65. It cites to broad support for eliminating the newspaper/broadcast cross-ownership rules, including from minority media owners, as evidence that doing so would not have an adverse effect on minority ownership. Respondent's Br. at 34. And it asserts that, while the data used was not perfect, it was the only evidence available as to the effects of earlier rounds of deregulation on ownership diversity. *Id*. at 40. The Commission solicited evidence on this issue during the notice-and-comment period, and it did not receive any information of higher quality than the NTIA/Form 323 data. Thus it argues it had no affirmative burden to produce additional evidence or to fund new studies itself. *Id*. at 47 (citing *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009)).

We are not persuaded. It is true that "[t]he APA imposes no general obligation on agencies to produce empirical

37

evidence," only to "justify its rule with a reasoned explanation." *Stilwell*, 569 F.3d at 519. But in this case the reasoned explanation given by the Commission rested on faulty and insubstantial data. In *Stilwell* the agency had proceeded based on its "long experience" supervising the regulated industry and had support from the commenters. *Id.* Here, the Commission has not relied on its general expertise, and, outside of the modifications to the newspaper/broadcast cross-ownership rule, it does not rely on support from commenters. It has not offered any theoretical models or analysis of what the likely effect of consolidation on ownership diversity would be. Instead it has confined its reasoning to an insubstantial statistical analysis of unreliable data—and, again, has not offered even that much as to the effect of its rules on female ownership.

Finally, it is true that promoting ownership diversity is but one of the policy goals the FCC must consider. But this only highlights that it is something the Commission must consider. It is, as *State Farm* says, "an important aspect of the problem." 463 U.S. at 43. The Commission might well be within its rights to adopt a new deregulatory framework (even if the rule changes would have some adverse effect on ownership diversity) if it gave a meaningful evaluation of that effect and then explained why it believed the trade-off was justified for other policy reasons. But it has not done so. Instead it has proceeded on the basis that consolidation will not harm ownership diversity. This may be so; perhaps a more sophisticated analysis would strengthen, not weaken, the FCC's position. But based on the evidence and reasoning the Commission has given us, we simply cannot say one way or the other. This violated the Commission's obligations under the APA and our remand instructions, and we "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

38

Accordingly, we vacate the Reconsideration Order and the Incubator Order in their entirety, as well as the "eligible entity" definition from the 2016 Report & Order. On remand the Commission must ascertain on record evidence the likely effect of any rule changes it proposes and whatever "eligible entity" definition it adopts on ownership by women and minorities, whether through new empirical research or an in-depth theoretical analysis. If it finds that a proposed rule change would likely have an adverse effect on ownership diversity but nonetheless believes that rule in the public interest all things considered, it must say so and explain its reasoning. If it finds that its proposed definition for eligible entities will not meaningfully advance ownership diversity, it must explain why it could not adopt an alternate definition that would do so. Once again we do not prejudge the outcome of any of this, but the Commission must provide a substantial basis and justification for its actions whatever it ultimately decides.

### E. Delay in Adopting Procurement Rules

Finally, Diversity Petitioners argue that the Commission has unreasonably delayed action on their proposal to extend the cable procurement rules to broadcast media. These rules require cable companies to encourage minority- and female-owned businesses to do business with them. *See* 47 C.F.R. § 76.75(e). A proposal to apply similar rules to broadcast media companies was one of the proposals we instructed the Commission to consider on remand all the way back in *Prometheus I. See* 373 F.3d at 421 n.59. In *Prometheus III*, the same Diversity Petitioners argued the FCC had unlawfully refused to address these proposals. We declined to pass on this challenge, noting that the Chairman of the FCC had committed to addressing these proposals in what eventually became the 2016 Report & Order, and thus the challenge was premature. *See* 824 F.3d at 50 n.11.

39

At the same time we "note[d] our expectation that the Commission will meet its proffered deadline." The 2016 Report & Order ultimately found that there was "merit in exploring" whether to adopt this proposal, and stated that it would "evaluate the feasibility" of doing so. *2016 Report & Order* ¶ 330. **[J.A. at 169]** The Notice of Proposed Rulemaking for the 2018 cycle sought comment on a number of aspects of this proposal, including its constitutionality. *See 2018 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Notice of Proposed Rulemaking*, 84 F.R. 6741, 6752 (Feb. 28, 2019)

As set out at length in *Prometheus III*, when reviewing a claim of unreasonable agency delay we evaluate four factors: first, the length of time since the agency came under a duty to act; second, the context of the statute authorizing the agency's action; third, the consequences of the agency's delay; and, finally, any claim of administrative error, inconvenience, or practical difficulty carrying out the obligation, especially in light of limited resources. *See* 824 F.3d at 39–40 (quoting *Oil, Chem. & Atomic Workers Union*, 145 F.3d at 123).

The Commission argues it has not unreasonably delayed action because the record as of the 2016 Report & Order did not support adopting the proposal—largely because the commenters did not offer any substantial supporting materials for it. *See* Respondent's Br. at 89. We agree. This is not like the eligible entity issue in *Prometheus III*, where the FCC had failed to act for well over a decade. At most, the agency's failure to act began with the 2016 Report & Order three years ago. And the consequence of the Commission's failure to act at that time was evidently to keep the proposal alive, rather than rejecting it outright for lack of support. Given all of this, not to mention

40

that the NPRM for the 2018 cycle has sought further comment on this proposal, we do not at this time find unreasonable delay by the Commission.

That being said, we do anticipate that the Commission will take final action on this proposal one way or another when it resolves the 2018 review cycle, at which time its decision will be subject to judicial review. If it does not do so, we may reach a different conclusion as to the reasonableness of that additional delay.

### F. Conclusion

Citizens and Diversity Petitioners have standing to press their claims. On the merits, we hold that the FCC's retention of the "top-four" prong of its local television ownership rule was not arbitrary and capricious. We also hold that the Incubator Order's definition of "comparable markets" was adequately noticed and was not arbitrary and capricious. And we decline to hold that the FCC has unreasonably delayed action on the proposal to adopt procurement rules for the broadcasting industry. We do conclude, however, that the Commission has not shown yet that it adequately considered the effect its actions since *Prometheus III* will have on diversity in broadcast media ownership. We therefore vacate and remand the Reconsideration and Incubator Orders in their entirety, as well as the "eligible entity" definition from the 2016 Report & Order.

Citizen Petitioners ask us to appoint a mediator or master to "ensure timely compliance" with our decision. Citizen Petitioners' Br. at 43. Courts will sometimes appoint a special master to oversee compliance with remedial decrees, but these

41

cases typically involve institutions such as prisons where the Court could not otherwise easily ascertain whether the defendant is complying, and the master's job is limited only to observing and reporting. *See, e.g.*, *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982), *amended in part and vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982) (*per curiam*). There is no need for such an observational special master here, where the Commission's actions on remand will be published in the Federal Register and readily available for subsequent judicial review. Moreover, we would decline in any event to appoint a special master with any powers beyond the simply observational, as doing so would raise grave constitutional concerns, *see e.g. Cobell v. Norton*, 334 F.3d 1128, 1141–42 (D.C. Cir. 2003), and we do not doubt the Commission's good faith in its efforts to comply with our requests.

Because yet further litigation is, at this point, sadly foreseeable, this panel again retains jurisdiction over the remanded issues.

Prometheus Radio Project et al. v. Federal Communications Commission, Nos. 17-1107, 17-1109, 17-1110, 17-1111, 18-1092, 18-1669, 18-1670, 18-1671, 18-2943 & 18-3335, **SCIRICA**, *Circuit Judge*, concurring in part and dissenting in part

The Telecommunications Act of 1996 mandates that the Federal Communications Commission (FCC) regularly review its broadcast media ownership rules to ensure they remain in step with the demands of a rapidly evolving marketplace. Yet some of these rules date back to the 1990s and early 2000s, and one all the way to 1975, before the Internet revolutionized American media consumption. Americans today increasingly rely on online sources for local news and information. Studies in the record reinforce what most people old enough to recall the days before WiFi and iPads understand instinctively: the explosion of Internet sources has accompanied the decline of reliance on traditional media. The realities of operating a viable broadcasting enterprise today look little like they did when the FCC enacted the current ownership rules. Despite all of this, the FCC's broadcast ownership rules remained largely static for fifteen years.

The FCC's most recent review of its ownership rules culminated in an order that accounted for these changes. The FCC evaluated the current market dynamics, concluded the existing rules built for a pre-Internet marketplace no longer serve the public interest, and repealed or modified the rules accordingly. The FCC weighed the rules' effects on competition, localism, and diversity to determine what changes would advance the public interest.

1

I join several parts of my colleagues' decision, including their rejection of the challenges to the incubator program's "comparable markets" definition and the *Reconsideration Order*'s retention of a modified "top-four" restriction in the Local TV Rule. But I do not share their conclusion that the *Reconsideration Order* and *Incubator Order* are arbitrary and capricious. In my view, the FCC balanced competing policy goals and reasonably predicted the regulatory changes dictated by the broadcast markets' competitive dynamics will be unlikely to harm ownership diversity. I would not delay the FCC's actions. I would allow the rules to take effect and direct the FCC to evaluate their effects on women- and minority-broadcast ownership in its 2018 quadrennial review.

**I.**

The parties are intimately familiar with the FCC's quadrennial review of the broadcast ownership rules. *See Prometheus Radio Project v. FCC*, 824 F.3d 33 (3d Cir. 2016) (*Prometheus III*); *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) (*Prometheus II*); *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) (*Prometheus I*). I summarize the relevant history and principles that guide this process before briefly reviewing the FCC's most recent action.

**A.**

The orders at issue stem from the FCC's review of its broadcast ownership rules. Through these rules the FCC advances its statutory mandate to regulate broadcast media as "public convenience, interest, or necessity requires." 47 U.S.C. § 303; *see Nat'l Broad. Co. v. United States*, 319 U.S. 190, 214

2

(1943). Early versions of the ownership rules cabined common ownership within and across broadcast media to promote the public interest. *See FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 780 (1978) (*NCCB*). The FCC adopted broadcast ownership rules with the objective to "promot[e] competition among the mass media" and to "maximiz[e] diversification of services sources and viewpoints." *Id.* at 784 (internal quotation marks and citation omitted). These in turn would benefit the public through higher quality programming and broader options. The FCC determines the appropriate amount of common ownership by weighing the harms of excessive concentration—diminished programming diversity, stifled competition, and the like—against the competitive realities of running viable broadcast enterprises.

A need for regulatory reform became palpable as the Internet emerged, transforming how Americans receive news and entertainment. Rapid technological change had left the framework regulating media ownership ill-suited to the marketplace's needs. The public interest analysis at the heart of the FCC's ownership rules is as dynamic as the media landscape. A static set of ownership regulations could not serve the public interest for all time. *See Prometheus I*, 373 F.3d at 437 (Scirica, C.J., dissenting in part and concurring in part).

With continued change all but certain, Congress retooled the approach to regulating affected markets. It enacted the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, which directs the FCC to review the broadcast ownership rules periodically. The relevant provision, Section 202(h), instructs:

The Commission shall review . . . all of its

3

ownership rules [quadrennially] as part of its regulatory reform review . . . and shall determine whether any of [its] rules are necessary in the public interest as the result of competition. The Commission shall repeal or modify any regulation it determines to be no longer in the public interest.

Telecommunications Act of 1996, § 202(h), *as amended by* Pub. L. No. 108-199, § 629, 118 Stat. 3, 99–100 (2004). "[C]ompetition, localism, and diversity" are the values that guide the FCC's "public interest" analysis under Section 202(h). *Prometheus I*, 373 F.3d at 400; *see also id.* at 446 (Scirica, C.J., dissenting in part and concurring in part). The FCC considers five types of diversity: viewpoint, outlet, program, source, and minority and women ownership. *See id.* at 446 (Scirica, C.J. dissenting in part and concurring in part) (summarizing the FCC's analysis in its 2002 biennial review order).

Embodied in Section 202(h) is the imperative that the broadcast ownership rules stay in sync with the media marketplace. *See id.* at 391. What is in the "public interest" changes over time as the marketplace evolves, so the FCC must reassess competitive conditions to set appropriate regulations. The provision's language and the accompanying legislative history reveal a belief that "opening all telecommunications markets to competition" will best suit a marketplace comprised of diverse media platforms and shaped by technological advancement. *See* H.R. Rep. No. 104-458, at 113 (1996) (Conf. Rep.). Section 202(h) directs the FCC to assess the harms of consolidation and abandon restrictions that deprive the public of competitive benefits associated with some levels of common

4

ownership.[1]

**B.**

The FCC concluded its 2010/14 quadrennial review by largely retaining the rules restricting common ownership. *See Second Report & Order, 2014 Quadrennial Regulatory Review*, 31 FCC Rcd. 9864 (2016) (*2016 Report & Order*). The rules, according to the FCC, "promote[d] competition and a diversity of viewpoints in local markets, thereby enriching local communities through the promotion of distinct and antagonistic voices." *Id.* ¶ 3.

On petitions for reconsideration, the FCC repealed or loosened most of these ownership rules. *See Order on Reconsideration and Notice of Proposed Rulemaking*, 32 FCC Rcd. 9802 (2017) (*Reconsideration Order*). The thrust of the FCC's analysis is that technological innovation and fundamental changes to the media marketplace have eroded many of the assumptions underlying the ownership rules. *See, e.g.*, *id.* ¶¶ 1, 19, 22, 43, 60, 71–73. The rules have thus ceased serving the public interest. The Internet boom has ushered in rivals that enjoy competitive advantages vis-à-vis broadcasters. The ownership rules impede broadcasters' ability to engage in procompetitive transactions without offering compensating benefits to the public.

The FCC's repeal of the Newspaper/Broadcast Cross-Ownership (NBCO) Rule illustrates the *Reconsideration Order*'s public interest balancing. The NBCO Rule barred

---

[1]     Although framed in deregulatory terms, we have understood the provision to allow modifications making the rules "more or less stringent." *Prometheus I*, 372 F.3d at 395.

combinations between broadcast stations and local newspapers to preserve "strong local voices." *Id.* ¶ 9. When the rule was adopted in 1975, daily print newspapers constituted a predominant voice in local news. The rule thus promoted viewpoint diversity and localism by ensuring independent sources of local content. But the FCC's careful study and informed judgment show this reasoning no longer holds. Traditional media compete with "digital-only news outlets with no print or broadcast affiliation." *Id.* ¶ 19. The FCC determined that the burst of Internet sources means local newspapers' independence from broadcast is no longer essential to promote viewpoint diversity. *See id.* ¶¶ 18–22. The flipside of this growth is the dwindling significance of print newspapers. Repealing the NBCO Rule, the FCC determined, lifts a barrier to combinations that may enhance localism. *See id.* ¶ 26. Transactions between broadcasters and local newspapers could enable "collaboration and cost-sharing" that improve program quality. *Id.* ¶ 27. These efficiencies could "attract new investment in order to preserve and expand" local programming. *Id.* ¶ 42. The FCC predicted repeal of the NBCO Rule "is unlikely to have a significant effect on minority and female ownership in" broadcast markets in part because broadcasters would be better positioned to acquire newspapers than the reverse. *Id.* ¶ 46. So ownership diversity, like competition and localism, did not justify keeping the rule. *See id.* ¶ 48.

While the FCC's public interest analysis balances competition, localism, and diversity, the last consideration has attracted most of the attention in this litigation. Neither the *2016 Report & Order* nor *Reconsideration Order* found evidence that showed keeping or changing the rules would affect ownership diversity. "[E]mpirical study of the

6

relationship between cross-ownership restrictions" and ownership diversity is complicated by "obstacles that make such study impractical and unreliable," the FCC observed, yet it invited comment on both study design and the likely connection. *Quadrennial Regulatory Review—Review of The Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, et al., Further Notice of Proposed Rulemaking and Report and Order,* 29 FCC Rcd. 4371 ¶ 198 n.595 (2014) (*2014 FNPRM*). The *2016 Report & Order* rejected arguments that making the rules more restrictive "will promote increased opportunities for minority and female ownership" because the record lacked evidence supporting such a causal connection. ¶ 77 (Local TV Rule); *see id.* ¶ 127 (Local Radio Rule). The *Reconsideration Order* considered the consequences of relaxing the rules on ownership diversity and determined the record did not support arguments that minority and women broadcasters would be harmed by the changes. *See, e.g.*, ¶ 15 (NBCO Rule) ("[W]e find that eliminating the rule will have no material effect on minority and female broadcast ownership."). No commenter introduced evidence that contradicted the FCC's prediction that changing the rules would unlikely affect ownership diversity. The *Reconsideration Order* announced the FCC's intention to pursue an incubator program, to facilitate entry and bolster ownership diversity. *See* ¶¶ 121–25.

## II.

Citizen Petitioners contend the FCC's orders are arbitrary and capricious because they do not adequately analyze the new rules' likely effects on minority and women

broadcast ownership. The APA's "arbitrary and capricious" standard together with Section 202(h) guide our review.

We must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). Under this deferential review, we uphold the FCC's decision provided it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983*)* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). Where, as here, the FCC makes predictions about the likely consequences of its decisions, "complete factual support in the record for [its] judgment or prediction is not possible or required." *NCCB*, 436 U.S. at 814; *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) ("Where . . . the FCC must make predictive judgments about the effects of [its regulations], certainty is impossible."). These predictions are "less amenable to rigid proof"; they "are more in the nature of policy decisions entitled to substantial deference." *NAACP v. FCC*, 682 F.2d 993, 1001 (D.C. Cir. 1982), *rev'd on other grounds*, *FCC v. Fox Telev. Stations, Inc.*, 556 U.S. 502 (2009).

As this Court has emphasized and notes again here, Section 202(h) "also affects our standard of review." *Prometheus III*, 824 F.3d at 40; *see* Maj. Op. 18. To the extent the meaning of Section 202(h) is disputed, the question would ordinarily "implicat[e] an agency's construction of the statute which it administers," thus triggering "the principles of deference described in" *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).

*INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999); *see also Sinclair Broad. Grp. v. FCC*, 284 F.3d 148, 165 (D.C. Cir. 2004) (deferring to FCC's reasonable interpretation of another provision of the Telecommunications Act of 1996 under *Chevron*).

## III.

My colleagues find, "based on the evidence and reasoning the Commission has given us," it has not satisfied its obligation to show changes in the ownership rules "will not harm ownership diversity." Maj. Op. 39. But the FCC enjoys a measure of deference when it balances policy objectives based on predictions of the consequences of its rules. This key disagreement leads me to depart from my colleagues in three respects. First, because the FCC's consideration of the interplay between its ownership rules and ownership diversity satisfies the APA and Section 202(h), I would deny the challenges to the *Reconsideration Order* and allow the new rules to take effect. Second, I believe the substance of the FCC's eligible entity definition and the process by which it was adopted accords with the APA. Third, I do not believe the FCC acted arbitrarily or capriciously when it adopted the *Incubator Order*. Accordingly, I would deny the petitions and allow the FCC's orders to take effect.

## A.

Citizen Petitioners leave untouched the FCC's core determination that the ownership rules have ceased to serve the "public interest." The *Reconsideration Order* chronicles significant changes throughout media markets and explains why maintaining the rules no longer serves that public interest

9

goal. No party identifies any reason to question the FCC's key competitive findings and judgments. Citizen Petitioners argue instead that all the rule changes that make up the *Reconsideration Order* should be vacated because the FCC did not adequately consider the new rules' likely effects on women- and minority-broadcast ownership. But neither Section 202(h) nor the APA requires the FCC to quantify the future effects of its new rules as a prerequisite to regulatory action. Congress prescribed an iterative process; the FCC must take a fresh look at its rules every four years. This process assumes the FCC can gain experience with its policies so it may assess how its rules function in the marketplace. The FCC has sufficiently explained its decision and deserves an opportunity to implement its policies.

Citizen Petitioners overlook "that the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference." *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981). The FCC's Section 202(h) review typifies agency policymaking entitled to deference, subject to the APA. Section 202(h) directs the FCC to balance competing goals—competition, localism, and diversity—to guarantee that its "regulatory framework [keeps] pace with the competitive changes in the marketplace." *Prometheus I*, 373 F.3d at 391. The FCC enjoys a "considerable amount of discretion" when it weighs objectives to reach policy decisions. *Rural Cellular*, 588 F.3d 1095, 1103 (D.C. Cir. 2009) (internal quotation marks and citation omitted). The record confirms the FCC analyzed the relevant considerations and properly exercised its discretion. *See, e.g.*, *Reconsideration Order* ¶ 63 (Radio/TV Cross-Ownership Rule) (concluding the rule "no longer strikes an appropriate balance between the protection of viewpoint diversity and the

10

potential public interest benefits that could result from the efficiencies gained by common ownership of radio and television stations in a local market"); *see also id.* ¶¶ 55–58 (rule no longer contributes substantially to viewpoint diversity); *id.* ¶ 59 (rule is out of step with "realities of the digital media marketplace"); *id.* ¶ 62 ("rule already permits significant cross-ownership in local markets"); *id.* ¶ 64 ("no evidence that any additional common ownership" resulting from repeal "would disproportionately or negatively impact minority- and female-owned stations").

Traditional principles of deference are particularly apt here. Not every decision the FCC makes is susceptible to precise analysis; some "rest on judgment and prediction rather than pure factual determinations." *WNCN Listeners Guild*, 450 U.S. at 594. Predictions about the future effects of rules not yet in being are "inherently speculative." *Council Tree Inv'rs, Inc. v. FCC*, 863 F.3d 237, 243 (3d Cir. 2017) (*Council Tree IV*) (internal quotation marks omitted).

The FCC reasonably predicted on the record before it that the new rules would not diminish or harm minority and women ownership. The question whether the rules and ownership diversity are interconnected was aired over the course of the 2010/14 quadrennial review. The FCC invited comment and data that might shed light on this connection. *See, e.g.*, *2014 FNPRM* ¶ 222. It concluded—based on its understanding of the broadcast markets, the evidence in the record, and the only data submitted—that repeal of the rules was unlikely to harm ownership diversity. *See, e.g.*, *Reconsideration Order* ¶ 83 (Local TV Rule) ("In this lengthy proceeding, no party has presented contrary evidence or a compelling argument demonstrating why relaxing this rule

11

will" harm ownership diversity.); *id.* ¶ 69 (adopting revised rule based on understanding of changed competitive dynamics); *id.* ¶ 71 (observing changes in marketplace but noting "broadcast television stations still play a unique and important role in their local communities"); *see also 2014 FNPRM* ¶ 224 (Radio/TV Cross-Ownership Rule) (noting no commenter has shown "low levels of [women and minority] ownership are a result of existing radio/television cross-ownership rule").[2] The effect the new rules will have on women- and minority-broadcast ownership may remain difficult to uncover until the FCC gains experience with the new rules. *See NCCB*, 436 U.S. at 796–97; *Council Tree Inv'rs, Inc. v. FCC*, 619 F.3d 235, 252–53 (3d Cir. 2010). Faced with such a question, "complete factual support in the record for the

---

[2] To the extent my colleagues require the FCC to conduct empirical analysis on remand, they risk impermissibly adding requirements beyond the APA. *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015). They quote *Stilwell v. Office of Thrift Supervision*'s instruction that the "APA imposes no general obligation on agencies to produce empirical evidence." Maj. Op. 38 (quoting 569 F.3d 514, 519 (D.C. Cir. 2009)). But they argue *Stilwell* is distinguishable because there the agency relied on its "long experience" supervising the industry and did not act on "faulty and insubstantial data" like the FCC did here. *Id.* Setting aside the FCC's eight decades regulating broadcast media, the basic principle that the APA "imposes no general obligation on agencies to produce empirical evidence" applies regardless of the quality of the data in the record. *Stilwell*, 569 F.3d at 519; *see Council Tree IV*, 863 F.3d at 244 ("[W]e review only for the use of relevant, not perfect, data."). Were it otherwise, the principle would be meaningless.

Commission's judgment or prediction is not possible or required." *NCCB*, 436 U.S. at 814. Under these circumstances settled principles of administrative law counsel deference to the FCC's prediction.[3]

Citizen Petitioners emphasize that the FCC acted on faulty minority-ownership data and no women-ownership data. *See, e.g.*, Citizen Petitioners' Br. 26–30. This data, which the FCC acknowledged as imperfect, measured minority ownership before and after two prior regulatory changes—in 1996 and 1999. Such data weaknesses are not fatal to the FCC's regulations—not only because, as noted, data gaps are inherent to predictive regulation, but also because it is not certain the data demanded would alter the FCC's analysis. First, Citizen Petitioners assume that the experience of these earlier changes will speak directly to the effects of the *Reconsideration Order*. Even if the FCC could obtain improved data on these decades-old regulatory changes, that information offers only modest predictive value for the consequences of the FCC's current rules regarding modernization. Second, as noted the FCC considers five types of diversity, not to mention competition and localism. The FCC's lack of some data relevant to one of these considerations should not outweigh its reasonable predictive judgments,

---

[3] This is true despite Citizen Petitioners' criticism of the FCC's methodology and data. Not only does the FCC have policymaking discretion, subject to the APA it also has discretion "to proceed on the basis of imperfect scientific information, rather than to invest the resources to conduct the perfect study." *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 717 (D.C. Cir. 2011) (quoting *Sierra Club v. EPA*, 167 F.3d 658, 662 (D.C. Cir. 1999)).

particularly in the absence of any contrary information, such that its entire policy update is held up.

The FCC must "repeal or modify" rules that cease to serve the public interest even when it lacks optimal data. Telecommunications Act of 1996, § 202(h). The FCC has revised its Form 323 and conducted outreach programs to ease compliance with its reporting requirements. *2016 Report & Order* ¶ 265. These are encouraging measures that could make the FCC's data more reliable, benefiting future quadrennial reviews. The FCC intends to take up a variety of diversity-related proposals in its 2018 quadrennial review. *See 2018 Quadrennial Regulatory Review—Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996, Notice of Proposed Rulemaking*, 33 FCC Rcd. 12111 ¶¶ 93–121 (2018). I would direct it to follow through on its announcement as well as study the effects of the latest rules on ownership diversity. I would not, however, delay the *Reconsideration Order* based on the analytical shortcomings Citizen Petitioners emphasize.

In short, I believe the FCC has explained its decision. I would deny the petitions and allow the *Reconsideration Order*'s rule changes to take effect.

## B.

My colleagues remand the *2016 Report & Order*'s eligible entity definition for the FCC to ascertain what effect the revenue-based definition will have on women and minority ownership. But the FCC adopted the eligible entity definition to "serve the public interest by promoting small business

14

participation in the broadcast industry and potential entry by new entrepreneurs." *See 2016 Report & Order* ¶ 279; *see id.* ¶¶ 280–86. It thoroughly explained its policy choice. The record indicated that the revenue-based eligible entity definition will promote the FCC's "traditional policy objectives . . . by enhancing opportunities for small business[es]." *Id.* ¶ 281. The FCC's brief experience with this definition confirmed "a significant number of broadcast licensees and permittees availed themselves of policies based on the revenue-based eligible entity standard." *Id.* ¶ 283 (observing widespread use of the policy allowing certain eligible entities generous construction permits). No commenters argued the revenue-based eligible entity definition does not serve the public interest according to the FCC's analysis. *Id.* ¶ 276.

This stands in contrast to the last time the FCC employed this definition. During its 2006 quadrennial review the FCC adopted a revenue-based eligibility entity definition to promote ownership diversity. The approach failed because the FCC provided no support for why its definition would "be effective in creating new opportunities for broadcast ownership by . . . women and minorities." *Prometheus II*, 652 F.3d at 470 (internal quotation marks and citation omitted). The key distinction, of course, is the FCC's policy decision to reorient its eligible entity definition. As revised, it is intended to "encourage innovation and enhance viewpoint diversity" by "promoting small business participation in the broadcast industry." *2016 Report & Order* ¶ 235. Because the FCC pursued the revenue-based definition in past efforts to promote ownership diversity, it evidently believed the definition would not harm ownership diversity. Nothing in the present record suggests otherwise. In my view the FCC properly complied with its obligations under the APA.

15

**C.**

Under today's outcome, I regret that the FCC's incubator program will not have an opportunity to stand or fall on its own merit. *See Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, 33 FCC Rcd. 7911 (2018) (*Incubator Order*). Citizen Petitioners take issue with the program's criteria for who is eligible to realize its benefits. The FCC adopted a two-prong eligible entity definition: participants must be both "new entrants" based on the number of stations owned and "small businesses" based on revenue. *See id.* ¶ 16. The FCC designed these criteria "to encourage new entry into" an "extremely capital-intensive" industry. *Id.* ¶ 18. The program's benefits will not exclusively accrue to minority and women broadcasters as the eligibility criteria sweep in all emerging radio broadcasters. This breadth is consistent with the incubator program's stated goal. Yet based on its review of data from incentive auctions, the FCC predicts that the "new entrant" prong will likely benefit prospective women and minority applicants. *Id.* ¶¶ 21–24.

The incubator program is a reasonable policy designed to "support the entry of new and diverse voices into the broadcast industry." *Id.* ¶ 1. The FCC "has long contemplated the potential for" a program that pairs emerging and experienced broadcasters to ease entry into radio broadcasting. *Id.* ¶ 2. The *Incubator Order* established the first program to convert these ideas into a concrete policy. *See* ¶ 3. Before adopting the program, the FCC considered alternative eligibility criteria and invited "comment on how to determine eligibility for participation in the incubator program." *Id* ¶ 17; *see id.* ¶¶ 28–30 (declining to adopt competing proposals that might prove "administratively inefficient," and committing to

16

"conduct outreach to help encourage participation in the incubator program by mission-based entities and Native American Nations" that are eligible). It then provided comprehensive reasoning to justify the path it chose. *See id.* ¶ 20 ("The record reflects that individuals seeking to purchase their first or second broadcast station are the ones that often face the most challenging financial hurdles."); *id.* ¶ 21 (citing incentive auction data showing definition could modestly benefit women and minorities); *id.* ¶ 22 (citing comments suggesting the same); *id.* ¶ 25 & n.53 (noting that revenue cap narrows band of eligible entities); *id.* ¶ 27 ("Use of an objective standard has the advantage of being straightforward and transparent for potential applicants, as well as administrable for the Commission without application of significant additional processing resources."). The FCC complied with the APA in determining its "eligible entity" definition. Its choice, in my view, is an aspect of program design largely left to the agency's policy discretion, subject to the APA, Telecommunications Act of 1996, and other relevant statutes. The FCC's order draws a rational line between the record and decision made, and I would allow the incubator program to take effect.

## IV.

For the reasons provided, I would deny the petitions for review and allow the FCC's orders to take effect.

17